## Michael v. Crescent Pipe Line Co., Appellant.

[Marked to be reported.]

| | |
|---|---|
| 159 | 99 |
| 170 | 368 |
| 159 | 99 |
| 189 | 205 |

*Eminent domain—Market value—Opinion of witness.*

An essential test of the competency of witnesses called to give an opinion in respect to the market value of land in condemnation proceedings, is that they should affirmatively appear to have actual personal knowledge of the facts affecting the subject-matter of the inquiry.

| | |
|---|---|
| 159 | 99 |
| e204 | ¹408 |
| e204 | ²408 |
| 204 | ¹411 |
| 159 | 99 |
| f210 | ²213 |
| e211 | ¹404 |

Such witnesses should have a sufficient knowledge of the market value of the land estimated upon a fair consideration of the land, the extent and condition of its improvements, its quantity and productive qualities, and the uses to which it may reasonably be applied, taken with the general selling price of lands in the neighborhood at the time.

| | |
|---|---|
| 159 | 99 |
| 215 | ¹583 |
| 159 | 99 |
| 216 | ¹536 |
| 216 | ¹537 |

*Eminent domain—Bond—Damages—Art. 16, § 8, Const.*

Damages in condemnation proceedings are not limited by the amount of the bond given by the company seeking to condemn the land, as article 16, § 8, of the constitution provides that the amount on appeal from assessments shall be determined by a jury according to the course of the common law.

| | |
|---|---|
| 159 | 99 |
| 222 | ¹536 |
| f224 | ²123 |

Argued Oct. 30, 1893. Appeal, No. 183, Oct. T., 1893, by defendant, from judgment of C. P. No. 2, Allegheny Co., Oct. T., 1892, No. 531, on verdict for plaintiff, James Michael. Before STERRETT, C. J., GREEN, WILLIAMS, MITCHELL, DEAN and THOMPSON, JJ.

Appeal from assessment of land damages.

On the trial, J. P. Auld, a witness for plaintiff, testified that he had lived within a mile of plaintiff's land almost all his life. " Q. Do you know of sales, Mr. Auld, in that neighborhood? A. Yes, I have understood there was quite a number of sales. Q. You have some idea of what the property sold for ? A. I have understood what the prices were. Q. I wish you would

state from your knowledge of sales in that neighborhood, what this property is worth an acre, as near as you can. By Mr. Carpenter: Q. That is for farming purposes or suburban residences? By the Court: Q. A year ago what would it have sold for in the market? A. Well, I presume it would have brought four hundred dollars an acre, this part of the farm. By Mr. Haymaker: Q. What damage, in your opinion, Mr. Auld, has Mr. Michael sustained by reason of the location of that line over his property? Objected to unless the witness has actual knowledge of the loss; counsel for defence object to any speculative theory. By the Court: We think the witness ought to show a little more knowledge. Without any facts, we do not think his guess ought to be considered by the jury. You must get some facts to show that the witness has a knowledge of what he is talking about. Q. I wish you would state to the jury how this line affects the value of that property, and why it does it? A. Well, it affects it just in this way, I think there is a large portion of the farm that could not be sold at all in five or ten acre lots at this time with that pipe line where it is." The witness stated, under objection and exception, that the total damage would be about three thousand dollars. [1]

[John Aldebrand, a witness for plaintiff, having testified that he resided within one half mile of plaintiff's land, that he knew something of the value of property in the neighborhood, knew of sales of land in the neighborhood, knew the location of the pipe line and the character of the land, was interrogated and made answer as follows: " Q. I wish you would state, Mr. Aldebrand, in what way that pipe line affects Mr. Michael's farm? A. Well, it's just as I say, it will affect the sale of this here piece of ground. If a man wants to buy he would want may be eight or ten acres and would pay a big price for that knob, because it's a beautiful knob, it would hurt the sale of that piece of ground. Q. Would it affect the sale of all the property lying south of the pike? A. Well, I don't know as it would very much, only this ground that this oil line runs through. Q. In speaking of the sales made out there, what size tracts have they been generally selling it? A. From three up to sixty acres. Q. That is the character of the sales during the last year? A. Yes, sir. Q. I wish you would state, Mr. Al-

debrand, what damage, in your opinion, Mr. Michael has sustained by reason of the location of that line?" The witness, under objection and exception, answered two thousand dollars.] [2]

Alexander Foster, a witness for plaintiff, testified that he lived at McKeesport and knew plaintiff's farm. " Q. Do you know of any sales of real estate in the neighborhood of Mr. Michael's property? A. Well, I know by hearsay of several pieces. Q. Of a number of sales? A. Yes, sir. Q. Do you know what the prices were for the various pieces of property? A. Well, by hearsay, I do, I believe. Q. What sized tracts were these various pieces you speak of? A. Well, from eight to fifteen acres, I believe." The witness, under objection and exception, stated the damages at from $1,500 to $2,000. [3]

[Andrew McClure, a witness for plaintiff, having stated that he lived in Versailles township, since 1863, within one and one half miles of plaintiff and that he knew the property and location of the pipe line, and the general value of the land in the neighborhood, was interrogated, and made answer as follows: " Q. Mr. McClure, you know the effect that a pipe line through a farm has upon the market value of it—whether it affects it or not? By Mr. Carpenter: Q. From actual knowledge, now, not from theory? A. Yes, sir. By Mr. Haymaker: Q. I wish you would look at the plan, and state if you know, about where the line passes through Mr. Michael's property. This is the pike here, Mr. McClure? A. Yes, sir. Q. Now, from your knowledge of the value of the property in that vicinity, from actual sales that you know of, what, in your judgment, is this property worth an acre, in that field, " A," or this property over which this line passes? A. Well, from my knowledge, it would be worth three or four hundred dollars an acre, for that piece of ground. Q. You mean without the pipe line on it? A. Without the pipe line. Q. I wish you would state, what, in your judgment, to what amount Mr. Michael is damaged by reason of the location of that line upon that part of his farm?" The witness, under objection and exception, answered from $1,500 to $2,000.] [4]

John Lang, a witness for plaintiff, testified that he had lived in North Versailles until about eleven year ago. " Q. Have you been back and forward to Versailles township since? A. Yes,

sir, every year. Q. Have you any knowledge of sales in North Versailles township? A. I know of sales by report. Q. Do you know the prices paid? A. I have heard the prices." The witness was asked what plaintiffs' farm was worth and answered, under objection and exception. " A. From knowledge I have of other sales in that neighborhood, I would suppose it was worth three hundred dollars an acre. Q. I wish you would state to what extent, in your judgment, it has damaged that property?" The witness answered, under objection and exception, from $1,200 to $1,500. [5]

James McClintock, a witness for plaintiff, testified that he was a farmer and lived about two miles and a half from plaintiff's farm. " Q. You know the value of real estate in the neighborhood of Mr. Michael's property? A. From what I hear. Q. Do you know of any sales in that neighborhood? A. I have heard of several sales and heard the prices. Q. And you know the properties sold? A. Yes, sir. Q. Now, from your knowledge of sales in that community, I wish you would state what you think Mr. Michael's farm is worth an acre, say that part of the farm lying south of the pipe. A. Taking it all through? Q. Yes. A. Well, from the way it sells for other people, he ought to have four hundred dollars an acre." This witness, under objection and exception, estimated the damages at from $1,500 to $2,000. [6]

John Taylor, a witness for plaintiff, testified: " Q. How near do you live to Mr. Michael's farm? A. There is only one small farm betwixt him and me. Q. I wish you would state whether you are acquainted with the value of real estate in that neighborhood? A. Well, I have heard them speak of real estate that was sold, I don't know just exactly that it was sold for those prices. Q. You know there have been sales? A. Of course, I know there have been sales. Q. And you have heard the prices? A. Yes, sir, conversation about them." The witness, under objection and exception, placed the damages at $2,500. [7]

Walter Foster, a witness for plaintiff, testified that he lived within three quarters of a mile of plaintiff's land all his life. " Q. Do you know the value of real estate in that vicinity? A. As far as I can know, by hearing what other people do. Q. You mean by sales, and the prices obtained? A. Yes, sir." The witness, under objection and exception, estimated the damages at $2,000. [8]

Gilbert Myer, a witness for plaintiff, testified that he was a real estate agent in McKeesport. "Q. Have you been in the neighborhood of plaintiff's property, frequently or otherwise? A. Quite frequently. Q. Do you know the value of real estate in the neighborhood of the Michael property? A. Yes, sir. Q. How have you acquired your knowledge, Mr. Myer? A. Well, I have sold some property in that neighborhood, and by hearing of sales, and what it was sold at. Q. I wish you would state what, in your judgment, the Michael property is worth an acre? A. I think it is worth from three hundred to three hundred and fifty dollars. Q. Do you know about where the pipe is located, Mr. Myer? A. Yes, sir. Q. I wish you would state what it is adapted for at the present time—the land at that place? A. Well, it is coming into the market very fast, for surburban residences. Q. Do you know of sales in the neighborhood for that purpose? A. Yes, sir. Q. How many sales do you know of? A. Well, I have heard of a considerable number. I have only made two sales myself. Q. Where were those sales, Mr. Myer? A. They were on part of the Overholt farm. Q. How near to the Michael property? A. Well, I don't think it would be over probably three quarters of a mile. Q. Are the residences going up there now? A. Yes, sir." The witness, under objection and exception, estimated the damages at one third of the value. [9]

Defendant offered in evidence the bond in the sum of $200 given by defendant to plaintiff, which was filed in Court of Common Pleas, No. 1, of Allegheny county, and confirmed absolutely, for the purpose of showing the limit of the amount of damage which the plaintiff can recover in this action. Plaintiff objected because the amount of money expressed in the bond does not limit the amount of damages which may be recovered in this action against the company. Objection sustained. Bill sealed. [10]

Verdict and judgment for plaintiff for $800. Defendant appealed.

*Errors assigned* were (1–10) rulings on evidence, quoting bills of exceptions and evidence as above.

*J. McF. Carpenter, S. D. Mitchell* and *Alexander Gilfillan*

with him, for appellants.—The witnesses were incompetent under Ry. v. Vance, 115 Pa. 325.

The bond stood for the land appropriated, and necessarily limited the recovery of damages: Fries v. S. P. R. & M. Co., 85 Pa. 73; Hoffman's Ap., 118 Pa. 512.

The compensation paid to an owner for the use of his land, while denominated damages, is the price of a purchased privilege: McClinton v. R. R., 66 Pa. 404.

*John C. Haymaker*, for appellee.—The proceeding below was commenced by petition for appointment of viewers, as provided by section 3 of the act of June 2, 1883, P. L. 61, which finally resulted in a trial by jury. This was not a suit on the bond given by the company, but an independent proceeding against the company alone. The same proceeding could have been carried on by plaintiff below in the absence of a bond; and it would have been held to have been a waiver of his right to an action of trespass or ejectment. If the "just compensation for property taken, injured or destroyed," provided by the constitution shall be limited to the amount of the bond, the court, in fixing the amount of the bond, and not the jury, will practically decide the amount of that compensation.

OPINION BY MR. CHIEF JUSTICE STERRETT, Dec. 30, 1893:

An essential test of the competency of witnesses, called to give an opinion in respect of the market value of land, is that they should affirmatively appear to have actual personal knowledge of the facts affecting the subject-matter of the inquiry: Railway Co. v. Vance, 115 Pa. 325. They cannot intelligently testify without such knowledge; its possession is a necessary element in the value of such testimony, but cannot be assumed; the court cannot pass on the question of competency until it be made to appear. Hence the possession and sufficiency of such knowledge should be made to appear and be passed upon by the court before the witness should be permitted to express any opinion. What constitutes sufficient knowledge was thus stated by Mr. Justice CLARK, in Railway Co. v. Vance, supra: "The market value . . . . is estimated upon a fair consideration of the land, the extent and condition of its improvements, its quantity and productive qualities, and the uses to which it

may reasonably be applied, taken with the general selling price of lands in the neighborhood at the time. The price which, upon full consideration of the matters stated, the judgment of well informed and reasonable men will approve, may be regarded as the market value: Railroad Co. v. Patterson, 107 Pa. 464. The general selling price of lands in the neighborhood cannot be shown by evidence of particular sales of alleged similar properties; it is a price fixed in the mind of the witness from a knowledge of what lands are generally held at for sale, and at which they are sometimes sold, bona fide, in the neighborhood."

The competency of the witnesses who were allowed to give their opinions in this case was not tested in the manner here indicated. What was the source, extent and character of their knowledge does not satisfactorily appear. They had "heard" of sales in the neighborhood, but how, where or from whom, was not stated. They do not profess to have had "a knowledge of what lands were generally held at for sale" in the neighborhood. With one exception they do not appear to have had any knowledge from either observation or personal experience of the effect of the pipe line upon farming lands. The value of opinions, given under such circumstances, is seldom, if ever, appreciable. The witnesses may have had the requisite knowledge, but it certainly was not made to appear; and for this reason the judgment must be reversed.

The tenth specification of error, claiming that the amount of damages, if any, to which plaintiff was entitled, was limited by the bond given by defendant, has no merit. The constitution expressly provides that "the amount of such damages in all cases of appeal shall, on the demand of either party, be determined by a jury, according to the course of the common law": Art. xvi, sec. 8. If the "amount" of the damages shall be determined "by a jury," the necessary inference is that the power of the jury in that respect cannot be limited by the act of the court in approving the bond tendered by defendant. The bond is not intended as a measure of damages, but merely as security. There is no provision for appeal from the order of court approving the bond; but, in recognition of the constitutional right of trial by jury, for the purpose of determining the amount of damages, express provision is made for appeal from any preliminary assessment of damages "by viewers or other-

wise." In practice, the court is generally careful to require a bond sufficiently large in amount to cover all damages to which the landowner may be entitled; but, whether that be done or not, the power of the jury, in the premises, is wholly unaffected by the amount that may be named in the bond.

Judgment reversed, and a venire facias de novo awarded.